Pbausoh, O. J.
Has Congress power to conscript citizens to «¿rue as agriculturists, and thereby take from the Staje the right to require them to perform ci Home Guard ” duty ? _ •
The only doubt I have had is as to the fir-t branch of the question, i. e., can the Con fed orate States, while one part of our citizens are put in Hie hold to fight with muskets, put another part in the field to work with ploughs?
"My brothers, Buttle and iVianly, are clear in the opinion that this may he done under, the war power, to raise 'and support annie--; and, indeed, it seems to fall within the'principles of the decision, in , Walton vs. Gatlin, 1 Winston, 318, that, iñ case of necessity, the power of the *23 Confederate States is unlimited, so far as the citizen? are concerned. Jt is my duty to conform to that decision.-.
Upon the other branch of the question, I have no difficulty. It is decided in Johnson vs. Mallett (at the extra term)'that the war power of the Confederate States, so. far as the States are concerned, is limited by their rights in regard to civil officers ; and the question is narrowed to this: is there also a limitation on the war power of the Confederate States, in regard to the rights of the States-under their war power ? • I think not; for the reason that the States have, by the provisions of the Constitution, subordinated the State. wr.ar power to that of the Confeder-. ate States., “No State shall engage in war, unless actually invaded, or in,, such imminent danger as will not admit of delay.’’ “Congress shall have power to call forth the militia, &c.,” the whole if necessary. So the war power of a State is secondary, and imposes no limitation on that of the'Confederate States. It follow’s that, although the State may Jiave, as in this instance, put citizens in the Home Guard, such action of the State is sub-, ject to the future action of the Confederate States, and.the latter,may rU/htfuUy take men out of the “ Home G-uard ” of a State, in order to put theni in the service of the Confederate States, under their paramount war power.
These “ agriculturists “ .are as fully in the. service o'fthe 'Confederate States, under the war power, as if they were ■figliting in the army. .They ar'e in the first jilace, con-scriptediffir the army, then exempted for the purpose of putting them’iri the service as agriculturists. This was douc in order to give them ap election to serve with a m-usket or with a plough. .But that, docs not afreet the question nor is it, in my judgouyat., at all varied hy the circumstance, that those having 15 slave# are exempted *24 'directly by the act, and others are exempted or detailed by the. President in his discretion, under the authority of the act.‘ If or the point is, they are all put in the service of the Confederate States as agriculturists, under the war power, and a State has ho right to interfere -with, or impair, the exercise of Us war power.'
Whether men are to work themselves in order to raise provisions for the army, or are to “ manage and oversee ” IS slaves, só as to make them work for that purpose, it is clear, that in either case, their efficiency as agriculturists for the government,'will be impaired, if they are required to do duty in the Home Guard.
I concur with Judge Battle in the opinion, that the petitioner is entitled to a judgment of discharge.
Battm, J.
The question in this; case is, whether the. petitioner, who is, whát is commonly called a bonded exempt, under the 1st, 2d and 3d-paragraphs of the 4th -clause of the 10Br section of tito act of Congress,, passed in February, 1864,.can be made to perform? military service in ■ the Home Guards, by force of the acts of our Legislature creating that organization. .The solution of this quosti on, depends upon the preliminary inquiries, first, whether the pe-, petitioner was,by virtue of the act of Congress.in the service of, and- performing duty for, the Confederate government, at the time when he was arrested by the defendant' for service in the Homo Guard ; and, secondly, whether Congress had power under the Constitution, to conscribe the petitioner for any other than services of a military kind.
Upon the first inquiry, I think there can not be a reasonable doubt. A critical examination of the 2d and 3d paragraphs of the clause'and section of the acts of Congress,- to which X b.avo referred, will show that the per- *25 *onal attention of tbe bonded exempt is, required m the management of tbe farm, to enable him to furnish th® government with the amount of provisions required of him. Jt is inadmissible to suppose that the government, was indifferent as to the source from which his quota of supplies was to be obtained. Tbe government expected him to produce the grain and meat on his own farmland not to purchase them from another person. The exigencies ot the country imperatively demanded that every man should produce what he, could, and the spirit of the act of Congress, in granting exemptions to the owners of fifteen able-bodied hands, and authorizing details in favor of the owners of a less'numher, evinces a clear design to stimulate production to the greatest extent. It is manifest that this policy would be thwarted, if a large slave owner, after securing his exemption, .should be/allowed to become indifferent whether he raised provisions on his. own farm, or purchased them, elsewhere. The rtequirement of a personal supervision of his farm, is furfher'shown by tbe proviso contained in the fith paragraph of the clause and section of tbe act referred-’to, which declares “ that all the-exemptions granted under this act shall only continue whilst the persons exempted are actually engaged in their respective pursuits or occupations.”. This proviso is evidently not confined "to the particular exemption spoken of in the same paragraph,, for it uses the term act ” instead of paragraph or clause, and the words, t£ their respective pursuits or occupations,” are clearly inapplicable, if contractors to carry the mail were the only persons meant. These words necessarily embrace all the classes of exempts mentioned in the whole c< act.”
A reference to the' exemption act of October, 3862, in favor of slave owners, and the general, dissatisfaction *26 which it caused throughout the country, will prove still more’fully that Congress intended, by the act of .186-4, i° place the'landed exempts from military duty into the service of the Confederate government, as producers.
The act of October, 1862, exempted from military service in the army the owner of twenty slaves, without regard to the age, sex or condition, “ to secure the proper police of the country.” But, notwithstanding the cause assigned for it, the fact of this exemption .of slave owners produced, as is well known, a popular clamor against the measure, which was so great, that Congress was compelled to yield to it; which it did, by repealing the’ act, and parsing the act of February, 1864. The latter act omits the odious feature in the former, and while ■ providing for the indispensable necessity . of keeping up a surveillance over slaves when.o'wned in large numbers, made it acceptable to the country, by demanding a vigorous service’ from the owners, as producers for the government.
The second inquiry is, whether Congress had power under the Constitution, to conscribe the petitioner for any' other than services of a military kind. That it had, I think, there can not be a doubt. Congress lfas conferred upon it' by the Constitution of the Confederate States, the power to declare war, and to raise and support armies. Art. 1, sec. 8, par. 11 and 12. 'These powers are conferred in unlimited terms ; except that no appropriation of money to that nse shall he for a longer .time than two years. Armies, when raised, must bb supported, and the power to support must be unlimited as the power to raise them. If the government have the money, or the ability to procure it, Congress may, ‘and usually does, appropriate that to the purpose -of purchasing the necessary supplies ; but if therij he no money in the treasury, and the *27 government bave no means of procuring a sufficient amount of it, I can not perceive any' reason wby these persons who would otherwise be in the field as soldiers, may not be compelled to furnish, according to their .respective abilities, jsuch provisions and munitions of war, as the army may need. This commutation of services is similar to the escuage, which-, in process of time,-was allotted in the feudal law, in exchange for the military services which the tenants in chivalry originally -owed the lord, of whom they held their lands. 2 Black. Com., 74. But, even supposingthatfhis commutation of services can not be compelled by Congress, there can be no objection to its being allowed to those who may prefer the service of raising provisions, to that.of performing military duty in the field or garrison. • •
From the foregoing consideratiops, I am clearly of opinion that the petitioner was, rightfully in the service of the Confederate government.'- This, as it seems to me, must settle the question as to his. liability to be seized and carried off as a member of the Home Guard.
The supremacy of the- war power of the Confederate, over that of the fitate government, cannot be disputed.
The personal service which the Confederate government has a right to'demand, and has demanded of the petitioner, is inconsistent'with that-which the State demands of him and, such being the case, the latter must give .way to the‘former. _ In this respect the bonded exempts differ from all those classes of exempts, from whom the Confederate government makes no demand of other kinds of service, as a condition of exemption from' military service. All of the latter kind of exempts, the S.at-e may, at its discretion, pass into its service in the Militia or Home Guard ■organizatiou. The Confederate government cannot ex *28 empt from the .service of the State, any person who is not «ailed into its own service ; but every one, who is doing service for it, must, of necessity, be' protected from being ¡forced into an inconsistent service for tSe State.
I concur, therefore, in opinion with Judge Heath, that the petitioner ought to be discharged ; but as he/ in deference to some prior adjudications of two of his brethren, en the bench of the Superior Court, made an order pro forma to remand the petitioner, 1 think that order should be reversed, with costs, and an order of 'discharge entered.